**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No. 7:14-CV-00295-F**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| $107,702.66 IN UNITED STATES | ) | |
| CURRENCY SEIZED FROM LUMBEE | ) | |
| GUARANTY BANK ACCOUNT NUMBER | ) | **RESPONSE OF CLAIMANTS** |
| 82002495, | ) | **LYNDON B. MCLELLAN AND** |
| | ) | **L&M CONVIENT MART, INC.** |
| Defendant, | ) | **TO PLAINTIFF'S MOTION** |
| | ) | **FOR VOLUNTARY DISMISSAL** |
| And concerning | ) | **WITHOUT PREJUDICE** |
| | ) | |
| LYNDON B. MCLELLAN and L&M | ) | |
| CONVIENT MART, INC., | ) | |
| | ) | |
| Claimants. | ) | |
| | ) | |

Claimants Lyndon B. McLellan and L&M Convient Mart, Inc. (d/b/a "L&M Convenient Mart") submit the following response to Plaintiff's Motion for Voluntary Dismissal Without Prejudice. Claimants agree that the Complaint should be dismissed. Claimants, however, submit that the Complaint should be dismissed *with* prejudice. Or, if the Court grants dismissal without prejudice, the Court should condition dismissal on the government's payment of fees, costs, and interest—as provided by Congress in the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA").

## INTRODUCTION

Lyndon McLellan has done nothing wrong, and yet the Internal Revenue Service ("IRS") seized his bank account—over $107,000—and forced him to litigate to get the money back. Lyndon runs a convenience store in Fairmont, North Carolina, where you can purchase a catfish

1

sandwich for $2.75. Lyndon worked over a decade, seven days a week, to build his modest savings. The IRS seized the bank account for the store in July 2014 because Lyndon's niece deposited the store's cash receipts into the account in amounts under $10,000. Under so-called "structuring" laws, the IRS asserted that the act of making sub-$10,000 deposits was itself a crime. Apart from the act of depositing particular sums of money in the bank, however, the IRS *never* alleged that Lyndon, his niece, or his company engaged in any criminal activity.

The government pressed forward with this case despite the fact that, in October 2014, the IRS announced that it would no longer apply the structuring laws in these kinds of cases. *See* Exhibit A. The government filed its Complaint on December 23, 2014, two months after the policy change. *See* D.E. 1. The DOJ announced a similar policy change in March 2015, and *still* the DOJ attorneys litigating the case for the IRS pressed forward—filing their First Amended Complaint on April 30, 2015. *See* Exhibit B; D.E. 15.

Although the docket in this case is deceptively short, the case arrives before this Court with a lengthy history. Ten months have elapsed since the government seized Lyndon's bank account. Government attorneys repeatedly told Lyndon that they intended to pursue forfeiture and repeatedly offered to settle the case for only a portion of the money. As late as March 2015, government attorneys told Lyndon they would settle for "50% of the money" and that Lyndon had to either "resolve this or litigate it." Exhibit C. Because Lyndon was unwilling to give up his hard-earned money, he expended significant resources preparing his defense. Indeed, although Lyndon's current counsel is representing him *pro bono*, Lyndon has personally incurred over $15,000 in legal and accounting fees in connection with the case.

Now the government has decided it does not want to litigate, after all, and has begun to maneuver to deny Lyndon any compensation for the expenses that he incurred as a result of the

government's actions. Congress, in the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), provided for payment of fees, costs, and interest in these kinds of cases. *See* 28 U.S.C. § 2465. The government initially asked Lyndon to waive that statutory right as a condition of getting his money back. *See* Exhibit D. When Lyndon refused, the government moved the very next day to dismiss *without* prejudice—a tactic that, in other cases, the government has subsequently used to argue that it is not required to pay fees, costs, or interest because the claimant does not qualify as a prevailing party under CAFRA. *See* D.E. 18.

While there is no question that the Complaint should be dismissed, the Court should reject the government's effort to avoid CAFRA's command to pay interest, costs, and fees. The government's reckless pursuit of this forfeiture action has caused great emotional and financial harm to Lyndon and his business. While Lyndon cannot be compensated for *all* of the damage he has suffered as a result of the government's actions, Congress has provided that Lyndon must be compensated in at least one respect—the government must pay his reasonable attorney fees and costs, as well as reasonable interest on the property. Having put Lyndon to such great expense for so little purpose, the government should not be allowed to avoid its relatively modest obligation under CAFRA to make Lyndon almost whole.

## BACKGROUND

Given the unusual posture of this case, as well as the broader systemic importance of the underlying issue regarding the availability of CAFRA fees, Claimants believe it is necessary to set forth the background to the government's motion in some detail. Claimants begin with a discussion of the civil forfeiture laws under which the government seized their bank account, then describe the facts that led to the seizure, and finally conclude with a brief discussion of the procedural history of the case subsequent to the seizure.

## A. The Structuring Laws And The Government's Policy Change.

This case involves the government's application of so-called "structuring" laws. Under the Bank Secrecy Act, financial institutions are required to report cash transactions over $10,000, including both deposits and withdrawals, to the United States Treasury Department. 31 U.S.C. § 5313(a). Structuring laws make it a crime to engage in a transaction of less than $10,000 with a specific purpose to evade the filing of a report. 31 U.S.C. § 5324(a). Using the civil forfeiture laws, the government can seize the entire bank account of a business or individual suspected of structuring. 31 U.S.C. § 5317(c)(2).

These laws were intended to target drug dealers, money launderers, and hardened criminals, but they have been applied to small business owners accused of nothing more than doing business in cash. In October 2014, *The New York Times* reported on two such cases involving Carole Hinders, an elderly restaurant owner in small-town Iowa, and Jeff, Richard, and Mitchell Hirsch, three brothers in the convenience-store distribution business on Long Island. *See* Shaila Dewan, *Law Lets I.R.S. Seize Accounts on Suspicion, No Crime Required*, N.Y. Times, Oct. 25, 2014, at A1.[1] In both of those cases, the government seized the business's entire bank account, only to back down months or years later and return all the money it had seized.

In response to public outcry, the government announced a change of policy intended to rein in enforcement of the structuring laws. In October 2014, the IRS announced that, absent "exceptional circumstances," it would henceforth limit application of the structuring laws to "illegal-source" cases, meaning cases where the money involved in the structured transaction

---

[1] Other small business owners targeted under the structuring laws include Terry Dekho, a grocery store owner in Michigan, and Mark Zaniewski, the proprietor of a gas station also located in Michigan. *See* Institute for Justice, Taken: Federal Lawsuit in Michigan Challenges Forfeiture Abuse, http://www.ij.org/michigan-civil-forfeiture-background (last visited May 20, 2015). The Institute for Justice, which represents Claimants here, has represented many of the property owners who have recently challenged structuring forfeitures.

4

was derived from illegal activity. *See* Exhibit A. Because other agencies, including the Secret Service and Postal Inspection Service, also have authority to enforce the structuring laws, it was necessary for the DOJ to adopt a similar policy change to restrict forfeitures not involving the IRS. The DOJ thus announced a similar policy change in March 2015. *See* Exhibit B.

**B.     Lyndon McLellan's Legitimate Convenience Store Business.**

Lyndon McLellan has lived all his life in Robeson County, North Carolina. *See* Exhibit E ("McLellan Dec.") ¶ 3. He grew up working in his parents' convenience store, called McLellan Grocery. *Id.* Although Lyndon is quite intelligent, he struggles to read even relatively straightforward written documents. *Id.* ¶ 7. For that reason, he left school after completing the 10th grade. *Id.*

In 2001, Lyndon decided to purchase a convenience store in Fairmont, North Carolina. McLellan Dec. ¶ 4. He called it L&M Convenience Mart. *Id.* When Lyndon purchased the store, it was just a few rows of products and some gas pumps. *Id.* Today, the store has expanded to include a restaurant, lunch counter, walk-in cooler, and long aisles of packaged goods. *Id.* Lyndon works long days, often opening and closing the store, seven days a week. *Id.* ¶ 5. He rarely takes vacations. *Id.*

Lyndon's niece, Mary Bruce Floyd, is generally responsible for depositing the business's receipts in the bank. McLellan Dec. ¶¶ 6-7; Exhibit F ("Floyd Dec.") ¶¶ 3-4. Back in 2001, when the business had just opened, a bank teller informed Mary Bruce that there was "paperwork" associated with cash deposits of amounts over $10,000. Floyd Dec. ¶ 5. Mary Bruce did not know what this paperwork consisted of. *Id.* ¶ 6. However, Mary Bruce assumed that she would have to fill out this paperwork herself and that it would be time-consuming. *Id.* ¶ 7. She worried that filling out the paperwork would hold up the line at the bank. *Id.* So, to save time for herself

5

and others behind her in line, she decided to keep her deposits under $10,000. *Id.* Mary Bruce

was attempting to cut down on what she thought was unnecessary red tape at the bank, not to

avoid reporting to the IRS. *Id.*[2]

Separately, Lyndon continued to run his parents' store, McLellan Grocery. McLellan

Dec. ¶ 8. The store does not turn much of a profit, but Lyndon intends to keep it going for largely

sentimental reasons as long as it does not lose money. *Id.* The store is a place where local people

(primarily senior citizens) gather to eat and socialize. *Id.* Lyndon also cashes checks for his

customers at McLellan Grocery, although he does not charge for the service. *Id.* ¶¶ 9-10. For

years, Lyndon took cash out of the bank in $9,500 increments, largely for use to cash checks. *Id.*

¶ 9. Lyndon selected the number $9,500 because he found that was an amount that provided

sufficient—but not excessive—cash on hand. *Id.*

**C.     The 2008 "Notification Of Law."**

In 2008, a group of approximately 5 federal agents came to McLellan Grocery to discuss

Lyndon's bank withdrawals. McLellan Dec. ¶ 9. The agents asked Lyndon why he selected the

number $9,500, and he explained his reasoning. *Id.* The agents did not explain that withdrawing

less than $10,000 could potentially violate the law. *Id.* ¶ 14. Instead, the agents asked Lyndon

---

[2] Notably, it is only "structuring" to break down cash deposits while knowing about, and
intending to avoid, U.S. Treasury reporting requirements; there is nothing illegal about breaking
down cash deposits to avoid vaguely-defined "paperwork" burdens. *See, e.g.*, *United States v.
Leak*, 123 F.3d 787, 793-95 (4th Cir. 1997) (reversing grant of summary judgment for
government in structuring case because property owners testified that they were not aware of
bank reporting requirements); *United States v. $255,427.15 in United States Currency*, 841
F. Supp. 2d 1350, 1356-59 (S.D. Ga. 2012) (denying government's motion for summary
judgment despite 286 cash transactions of $9,000 by owner of convenience store because the
court could not conclude from mere pattern of transactions that the store owner knew about and
was trying to avoid Treasury reporting); *United States v. $79,650.00 Seized From Bank of
America Account*, No. 1:08-cv-01233, 2010 WL 1286037, at *4-5 (E.D. Va. Mar. 29, 2010)
(denying summary judgment to government because, although claimant admitted knowing that
the bank had to fill out a form if he deposited more than $10,000, he did not know it was a
government form).

questions about what he was doing with the money. *Id.* ¶ 10. When he told them that he used the money to cash checks, they asked a series of questions to determine if Lyndon was required to have a check-cashing license. *Id.* Because he only cashed small checks and did not charge for the service, Lyndon was not required to be licensed. *Id.* The agents also asked if Lyndon would ever purchase SNAP credits (*i.e.* food stamps), and he told them he would not. *Id.*

The agents directed Lyndon to sign a paper, titled a Notification of Law. McLellan Dec. ¶ 11. Written in dense legalese, the paper explained that "Title 31 United States Code, Section 5313, and its implementing regulation, 31 Code of Federal Regulations, Section 103.22, require banks and many other domestic financial institutions (defined at Title 31, United States Code, Section 5312) to file Currency Transaction Reports, Form 104, with the Financial Crimes Enforcement Network for all currency transactions in excess of $10,000." D.E. 15-2. Continuing in similarly dense language, the paper set forth federal law regarding structuring. Lyndon does not recall if he even tried to read the paper. McLellan Dec. ¶ 11.[3] However, Lyndon is certain that, at the conclusion of the interview, he did not understand that withdrawing money in amounts under $10,000 could potentially violate the law. *Id.* ¶¶ 13-14. The agents did not leave Lyndon with a copy of the Notification, so he had no opportunity to ask anyone with legal training to explain what it said. *Id.* ¶ 12.

At the conclusion of the 2008 interview, Lyndon asked one of the agents if he needed to change anything about his business or banking practices. McLellan Dec. ¶ 13. The agent told him that they understood what he was doing, that he was not doing anything illegal, and that he did

---

[3] Had he attempted to do so in 2008, he would not have understood it. Lyndon first received a copy of the Notification of Law in 2015. When he attempted to read the paper then, he could not understand it. *See* McLellan Dec. ¶ 12.

7

not need to change what he was doing. *Id.* As a result of that conversation, Lyndon continued to withdraw money from the bank in $9,500 amounts. *Id.* ¶ 14.

### D. The Government's Seizure Of L&M's Bank Account.

In July 2014, more than five years after that conversation, the federal government obtained a warrant to seize the bank account for L&M Convenience Mart. *See* D.E. 15-1. The government obtained the warrant on the basis of an affidavit filled out by a state law enforcement agent working as a deputized member of an IRS task force. *Id.* ¶ 1. The state agent identified a number of under-$10,000 cash deposits made by Mary Bruce and concluded—on the basis of that bare pattern of deposits—that Lyndon and L&M were guilty of structuring. *Id.* ¶ 8. The government then seized the entire bank account for L&M, containing over $107,000—money that it took Lyndon years to earn, and that he was counting on for his retirement.

After seizing the bank account, a group of 12 to 15 state and federal law enforcement agents came to L&M Convenience Mart. *See* Floyd Dec. ¶ 10. These agents isolated Mary Bruce in the business's office—a small, closet-like space—and crowded in the doorway to block her egress. *Id.* The agents asked Mary Bruce why she deposited money in amounts under $10,000, and she told them about the conversation that she had with a bank teller approximately 13 years before. *Id.* ¶ 11. When she told them that she believed she would have to fill out paperwork, they told her she was mistaken and that in fact *the bank* would file a report. *Id.* Mary Bruce told the agents she had no idea that was the case. *Id.*

The agents separately isolated Lyndon in a back storeroom. McLellan Dec. ¶ 16. The agents asked if Lyndon was aware that banks report deposits over $10,000 to the government, and Lyndon said that he was not aware. *Id.* The agents asked Lyndon if he was aware of the structuring laws, and Lyndon told them he was not. *Id.* The agents then showed Lyndon a list of

under-$10,000 deposits made by Mary Bruce, and Lyndon explained that he did not make the deposits for the business. *Id.* ¶ 17. Then, finally, the agents told Lyndon they had taken the bank account for the store. *Id.* ¶ 19.

At that point, the agents presented Lyndon with a piece of paper, captioned "Consent to Forfeiture," and instructed him to sign. McLellan Dec.¶ 20. In language whose import would be obvious only to a person with legal education, the paper stated that all the money seized by the government was "knowingly and voluntarily forfeited to the United States." D.E. 15-3. Because Lyndon has difficulty reading, he did not attempt to rely on his own reading comprehension to understand the document. McLellan Dec. ¶ 20. Instead, he asked the agents if, by signing the document, he was agreeing that what they were doing was right. *Id.* They told him, "No, Sir." *Id.* On that basis, Lyndon signed. *Id.* ¶ 21.[4]

### E. "Your Client Needs To Resolve This Or Litigate It"

Shortly after the seizure, Lyndon retained an attorney in Raleigh, Mike Petty, to assist with the case. McLellan Dec. ¶ 24. Mike Petty charged Lyndon a $3,000 retainer to secure his services. *Id.* Further, at the advice of Mike Petty, Lyndon also retained his longtime accountant, Henry Lewis of Lewis & Lewis CPAs, to conduct an analysis of the business's receipts and cash deposits during the time period covered by the affidavit underlying the seizure. *Id.* ¶ 25. The purpose of the analysis was to determine, first, whether cash deposits during that period corresponded with the legitimate proceeds of the business, and, second, whether cash income during the period was reflected in the business's tax returns. Exhibit G ("Lewis Dec.") ¶ 6.

---

[4] Notably, the "Consent to Forfeiture" does not contain *any* commitment binding the United States. *See* D.E. 15-3. Even if this form were not rendered invalid by the manner in which Lyndon's signature was obtained, it plainly lacks the mutual consideration necessary to make it legally binding. *See* 15B Am. Jur. 2d Compromise and Settlement § 23 ("A compromise and settlement must be supported by consideration *on both sides*," meaning "*reciprocal* concessions of the parties to adjust their differences") (emphasis added).

9

Lyndon, his attorney, and his accountant met with the government attorney handling the case, Assistant United States Attorney Steve West, in October of 2014. McLellan Dec. ¶ 26. At that meeting, the accountant explained to Steve West that he had determined that all income during the period was accounted for on the business's tax returns. *Id.*; *see also* Lewis Dec. ¶ 6. At the conclusion of the meeting, Steve West indicated that he believed an appropriate resolution of the case would be for Lyndon to agree to forfeit some portion of his bank account to the government, and he suggested that Lyndon propose a forfeiture amount that he would view as "fair." McLellan Dec. ¶ 27. Lyndon did not want to give the government any portion of his hard-earned money, so he did not pursue that offer. *Id.*

In the meantime, in February 2015, Lyndon's case was discussed at a hearing before the U.S. House Ways and Means Oversight Subcommittee. Without naming the case, Representative George Holding of North Carolina indicated that he had reviewed the seizure affidavit and had not seen any indication that Lyndon was suspected of criminal activity. Representative Holding expressed concern that the case was not in compliance with the IRS policy change. The IRS Commissioner responded: "If that case exists, then it's not following the policy." [5]

In March of 2015, Lyndon's attorney sent a link to video of that hearing to AUSA Steve West. Steve West responded that he was "concerned" that a copy of the affidavit had been provided to Congress. *See* Exhibit C.[6] Steve West wrote that publicity about the case "doesn't

---

[5] Video of the hearing is available at http://www.ustream.tv/recorded/58691793. The relevant discussion starts at approximately 58:00.

[6] Specifically, Steve West stated that he was concerned because the affidavit had been filed under seal with the court that issued the seizure warrant. *See* Exhibit C. However, Steve West *himself* broke the seal on the affidavit when he provided a copy to Lyndon, who, after all, was not a party to the seizure warrant proceeding. The point of filing seizure warrants under seal is to keep them secret from the property owner—in this case, Lyndon—not to keep forfeiture proceedings secret from Members of Congress.

help" and "only ratchets up feelings in the agency." *Id.* He offered to "return 50% of the money" and announced: "Your client needs to resolve this or litigate it." *Id.*

Presented with a choice between a 50% settlement and litigation, Lyndon retained new *pro bono* counsel and proceeded to litigation. McLellan Dec. ¶ 30. But the government did not even allow the case to get to discovery. Less than two weeks after Lyndon filed his Answer to the Complaint, and less than two months after the government insisted on a 50% settlement, the government offered to return 100% of the money if Lyndon agreed to waive his right to attorney fees, costs, and interest, as well as any claim against the government relating to the seizure. *See* Exhibit D. Lyndon declined that offer, explaining that he would not waive his legal rights in order to get back his lawfully-earned money. *Id.*

The very next day, on May 13, 2015, the government filed its Motion for Voluntary Dismissal. D.E. 18. The motion concedes that "a forfeiture action like this . . . would not be commenced" under current government policy—policy that, it bears emphasis, was adopted by DOJ over one month previously and by the IRS over six months previously—and states that the government has chosen to drop the case "in light of" that policy. *Id.* ¶ 8.

## ARGUMENT

After an answer to the complaint has been filed, Federal Rule of Civil Procedure 41(a)(2) authorizes voluntary dismissal "only on court order, on terms that the court considers proper." This rule allows the Court to "exercise discretion over voluntary dismissals" to protect the interests of the parties. *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 177 (4th Cir. 2007). The Court must ask if any party would be "unfairly prejudiced" by permitting dismissal. *Davis v. USX Corp.*, 819 F.2d 1270, 1273 (4th Cir. 1987). The Court may then "impose conditions on voluntary dismissal to obviate any prejudice." *Id.* Among other things, the Court may order

11

dismissal with prejudice, *see, e.g.*, *Hobbs v. Kroger Co.*, 175 F.3d 1014 (4th Cir. 1999) (table op.), or may condition dismissal without prejudice on payment of attorney fees and other costs, *see, e.g.*, *Sadler v. Dimensions Health Corp.*, 178 F.R.D. 56, 60 (D. Md. 1998).

In this case, the government's Motion for Voluntary Dismissal poses a distinct risk of prejudice to Claimants—specifically, the loss of their statutory right to attorney fees, costs, and interest under 28 U.S.C. § 2465. The government is seeking dismissal without prejudice, not to preserve the government's right to file suit at a later time, but instead in a transparent effort to deprive Claimants of the "prevailing party" status necessary to recover under that fee provision. The government's gambit to evade its statutory obligations should not be rewarded. Having dragged Claimants into ten months of costly and unnecessary legal proceedings, the government should be required to make Claimants whole—as Congress in fact provided for in CAFRA. To ensure that result, this Court should either dismiss *with* prejudice or condition dismissal *without* prejudice on an award of attorney fees, costs, and interest.

## I.    The Government's Motion For Voluntary Dismissal Is Calculated To Cause Substantial Prejudice To Claimants.

Congress, in CAFRA, provided that a claimant who "substantially prevails" in a "civil proceeding to forfeit property" is entitled to attorney fees, litigation costs, and interest. 28 U.S.C. § 2465. This provision was intended to provide property owners in civil forfeiture cases "the means to recover their property and make themselves whole after wrongful government seizures." *United States v. Certain Real Prop.*, 543 F. Supp. 2d 1291, 1294 (N.D. Ala. 2008) (quoting H.R. 192, 106th Cong. (1999)). Just days before filing its Motion for Voluntary Dismissal, the government unsuccessfully asked Claimants to waive that statutory right as a condition of recovering their money. *See* Exhibit D. Now, the government is seeking to achieve through legal maneuvering the result it could not exact through negotiation.

12

Specifically, by seeking dismissal without prejudice, the government it setting itself up to argue that Claimants are not entitled to fees under CAFRA because Claimants do not qualify as prevailing parties. Indeed, the government recently avoided its obligation to pay fees under CAFRA by making precisely that argument in a closely-analogous case also involving Claimants' counsel in the United States District Court for the Northern District of Iowa. *See United States v. Thirty-Two Thousand Eight Hundred Twenty Dollars and Fifty-Six Cents in U.S. Currency*, No. C13-4102, 2015 WL 3385003 (N.D. Iowa May 22, 2015). There, as in this case, the government sought voluntary dismissal without prejudice after seizing an innocent small business owner's entire bank account under the structuring laws. *Id.* at *1. Then, the government successfully argued that dismissal without prejudice deprived the claimant of prevailing party status under CAFRA. *Id.* at *4.

Although Claimants intend to seek fees, costs, and interest under CAFRA regardless of whether the action is dismissed with or without prejudice, there is no question that a motion for CAFRA fees will face greater obstacles if the action is dismissed without prejudice. Several courts have held—albeit incorrectly—that claimants do not qualify for prevailing-party status under CAFRA where a forfeiture complaint is dismissed voluntarily without prejudice. *See, e.g.*, *United States v. Craig*, 694 F.3d 509, 512 (3rd Cir. 2012); *United States v. Dougherty*, 486 F. App'x 621, 622 (8th Cir. 2012); *United States v. Minh Huynh*, 334 F. App'x 636, 639 (5th Cir. 2009); *United States v. 2007 BMW 335i Convertible*, 648 F. Supp. 2d 944, 951-52 (N.D. Ohio 2009); *United States v. $13.275.21, More or Less, in United States Currency*, No. 06-CA-171, 2007 WL 316455, at *4 (W.D. Tex. Jan 31, 2007).

The loss of the right to fees, costs, and interest would be a significant blow to Claimants, who expended significant resources to recover their lawfully-earned property. As is common in

civil forfeiture cases, Claimants were induced to expend significant resources even before litigation began—including paying an accountant to analyze their cash receipts and bank deposits to prove that no wrongdoing occurred. *See* McLellan Dec. ¶ 31; Lewis Dec. ¶ 8. That analysis was presented to government attorneys and would have been used as part of Claimants' case. The government encouraged such expenditure, repeatedly informing Claimants that they must either settle or litigate. Yet, when Claimants refused to settle, the government revealed that it did not intend to litigate, after all, and instead wished to drop the case. Claimants should not be left holding the bag for costs that they incurred only because of the government's conduct.[7]

More broadly, sanctioning this litigation gambit by the government would undermine Congress's intent in CAFRA to ensure that the government provides some, limited recompense to property owners—like Claimants—who have their property wrongly seized, and who are then forced to fight the government to get their property back. Nothing would stop the government from pursuing this same strategy in every civil forfeiture case: pursuing meritless allegations, demanding a substantial settlement, and then dropping the case without consequence whenever property owners displayed the wherewithal to reject the proposed settlement terms. Congress, by providing for fees in CAFRA, sought to create consequences for that kind of conduct. Yet the government's litigation tactic, if successful, would allow the government to avoid any consequence for its wrongful seizure in this and any other case.

---

[7] Although Claimants' primary purpose in seeking fees is to ensure that Claimants are made whole, Claimants note that they also intend to seek compensation for the work of their current, *pro bono* attorneys. *See Cornelia v. Schweiker*, 728 F.2d 978, 987 (8th Cir. 1984) (explaining that "the fact that [a party] was represented by counsel on a *pro bono* basis does not preclude an award of fees"). Providing fees for *pro bono* counsel advances Congress's purpose in CAFRA of ensuring the availability of representation for claimants in civil forfeiture actions by making it more likely that attorneys will take on such cases on a *pro bono* basis.

14

## II.     Causing This Prejudice To Claimants Is The *Only* Conceivable Basis For The Government To Seek Dismissal Without Prejudice.

This prejudice to Claimants is compounded by the fact that depriving Claimants of their right to attorney fees is the *only* apparent reason for the government's decision to seek dismissal without prejudice. Ordinarily, a party seeks dismissal without prejudice to enable it to file suit again at a later time. But—for at least two separate reasons—the government plainly is not going to file this suit again.

*First*, any further attempt to forfeit Claimants' money would be barred by the IRS and DOJ policy changes. There can be no question that those policy changes apply to the current case; the government explicitly states that, under current policy "a forfeiture action like this . . . would not be commenced." D.E. 18, ¶ 8. The government states the DOJ policy change is "not retroactive" and therefore is "inapplicable to the current case." *Id.* But that reasoning would not apply to a future action, as the DOJ policy only carves out a "*pending* civil action or criminal prosecution." Exhibit B at 4. If the government were to re-file the instant case after dismissal, the new forfeiture case would not be one that was "pending" at the time the policy change was adopted. Once this case is dismissed, the government will be barred by its own policy from pursuing these allegations again.[8]

*Second*, any further action to forfeit Claimants' money would be untimely. The government in a civil forfeiture case must ordinarily show that the *precise* property at issue is traceable to a crime, but, in cases involving currency comingled in a bank account, meeting that traceability requirement "is nearly impossible." *United States v. All Funds Presently on Deposit*

---

[8] Although the government does not mention it in its motion, further pursuit of these allegations would also violate the IRS policy change, which on its face says nothing at all about retroactivity and clearly states that the IRS "*will no longer pursue* the seizure and forfeiture of funds associated solely with 'legal source' structuring cases." Exhibit A (emphasis added).

15

*or Attempted to Be Deposited in Any Accounts Maintained at Am. Express Bank*, 832 F. Supp. 542, 556 (E.D.N.Y. 1993). Congress responded to that concern by lifting the requirement of traceability for forfeitures of currency, but *only* on the condition that suit is filed within one year of the alleged offense. *See* 18 U.S.C. § 984(b). The government was able to rely on that provision when it initiated the current case. *See* D.E. 15-1 ¶ 14. But that would no longer be true if the government were to re-file, as the last deposit at issue occurred on April 24, 2014. *See id.* ¶ 8. As a practical matter, after this case is dismissed it cannot be re-filed.

Against this backdrop, the government cannot possibly maintain that it is seeking dismissal without prejudice in order to pursue these allegations in some other, future proceeding. There is only one plausible reason why the government would insist on dismissal without prejudice: to undermine Congress's clearly-stated intent in CAFRA to provide for attorney fees, costs, and interest for successful civil forfeiture claimants.

### III. To Avoid Prejudice To Claimants, This Court Should Dismiss The Complaint *With Prejudice*.

To avoid this prejudice to Claimants, and to ensure that Claimants can recover the fees, costs, and interest that they are entitled to under CAFRA, this Court should order the Complaint dismissed *with* prejudice. *See*, *e.g.*, *2007 BMW*, 648 F. Supp. 2d at 955 n.10 (explaining that a court may dismiss with prejudice "in order to ensure recovery under the CAFRA 'substantially prevails' standard"); *$13.275.21, More or Less*, 2007 WL 316455, at *5 (similar). There is no real question that the government's Motion for Voluntary Dismissal brings this matter to its final conclusion. Dismissal with prejudice would appropriately recognize that fact, while avoiding prejudice to Claimants' statutory right to be made whole at the conclusion of this ordeal.

Indeed, where dismissal without prejudice serves no purpose other than to avoid an award of fees, failure to dismiss *with* prejudice is an abuse of discretion. *See United States v. Ito*, 472 F.

16

App'x 841 (9th Cir. 2012). In *Ito*, a district court dismissed a civil forfeiture complaint without prejudice at the request of the government. The Ninth Circuit reversed, ordering the case dismissed with prejudice, on the ground that the claimants "suffered plain legal prejudice in losing their ability to move for attorney's fees." *Id.* at 842. Dismissal without prejudice in this case would be likewise prejudicial.

*United States v. Certain Real Property*, 543 F. Supp. 2d 1291 (N.D. Ala. 2008), is also directly on point. In that case, after the government commenced a civil forfeiture case and then moved to dismiss without prejudice, the court ordered the complaint dismissed *with* prejudice in order to preserve the right to fees under CAFRA. The court explained that it was "clear" that the "government has no intention of further pursuing this civil action," meaning that dismissal without prejudice would serve no purpose other than to evade an award of fees under CAFRA. *Id.* at 1292. Just as the government in this case has adopted a policy that will bar further pursuit of civil forfeiture, the government in *Certain Real Property* had "admitted that it does not intend to further pursue this matter." *Id.* Given those facts, the court found that, "[i]f the court were to side with the government and dismiss this case without prejudice and deny the claimants request for attorneys' fees under CAFRA it would render the fee-shifting provisions of CAFRA essentially meaningless," as the government could always avoid the obligation to pay fees under CAFRA by seeking dismissal without prejudice. *Id.* at 1294.[9]

As in *Certain Real Property*, the government seeks dismissal without prejudice not because it wishes to re-file the action, but rather because it wishes to avoid its obligation under

---

[9] The Eleventh Circuit, on appeal, disagreed with the measure of fees awarded by the district court, but did not question the decision to dismiss *with* prejudice or to award fees under CAFRA. *See United States v. Certain Real Property*, 579 F.3d 1315, 1326 (11th Cir. 2009) (vacating and remanding "for recalculation of the fees and interest due consistent with this opinion").

17

CAFRA. This case has come to a close. The action cannot be re-filed. The Court should recognize that fact by dismissing the action with prejudice.

## IV. Alternatively, This Court Should Condition Dismissal Without Prejudice On Payment Of Fees, Costs, And Interest.

Alternatively, this Court may avoid prejudice to Claimants by conditioning dismissal without prejudice on an award of fees, costs, and interest under CAFRA. *See, e.g.*, *$13,275.21 More or Less*, 2007 WL 316455, at *5 (to avoid any prejudice from voluntary dismissal of forfeiture action, courts may "order reimbursement of attorney's fees and costs as a condition of the dismissal without prejudice").

If the Court opts to take this route, however, the Court should be clear that it is awarding *all* of the fees, costs, and interest that would otherwise be available under CAFRA. Courts generally hold that an award of attorney fees under Rule 41 encompasses only work that would not be useful in a later-filed action, as it is "an abuse of discretion to award fees when the product of those fees can easily be carried over to subsequent litigation." *Best Indus., Inc. v. CIS BIO Int'l*, 134 F.3d 362 (4th Cir. 1998) (table op.). Imposing that limitation would be inappropriate here, for at least two reasons: First, there *cannot* be any subsequent litigation, so in fact *none* of the work involved in recovering Claimants' property can be "carried over to subsequent litigation." And, second, imposing such a limitation would arbitrarily limit the amount of fees that Congress intended to make available under CAFRA, and would frustrate Congress's aim in enacting CAFRA to ensure that property owners subjected to meritless civil forfeiture actions are made whole at the end of the day.

Ultimately, regardless of whether this Court opts to dismiss with or without prejudice, this Court must honor Congress's determination in CAFRA that successful forfeiture claimants ought to be made whole. There is no real question that—after ten months of expensive and time-

18

consuming effort—Claimants will recover the property that was taken from them by the government. Claimants are precisely the kinds of property owners that Congress intended to compensate in CAFRA. However this Court chooses to dispose of the government's Motion for Voluntary Dismissal, that statutory right to compensation should not be compromised.

## CONCLUSION

Claimants agree there is no question that the case should be dismissed. But, in dismissing the action, the Court should ensure that Claimants are not prejudiced by the loss of their statutory right to be made whole—either by dismissing *with* prejudice, or by conditioning dismissal without prejudice on an award of fees, costs, and interest under CAFRA.

Respectfully submitted, this 29th day of May, 2015.

**COATS & BENNETT, PLLC**                     **INSTITUTE FOR JUSTICE**


By: _/s/ James R. Lawrence, III_              By: _/s/ Robert Everett Johnson_
    James R. Lawrence, III                            Robert Everett Johnson
    NC State Bar No. 44,560                            VA State Bar No. 83,219*
    1400 Crescent Green, Suite 300                     Scott Bullock
    Cary, North Carolina 27518                         DC Bar No. 442,379*
    Telephone: (919) 854-1844                          901 North Glebe Rd., Suite 900
    Facsimile: (919) 854-2084                          Arlington, VA 22203
    Email: jlawrence@coatsandbennett.com               Telephone: (703) 682-9320
                                                  Facsimile: (703) 682-9321
**Local Civil Rule 83.1 Counsel for**             Email: sbullock@ij.org
**Claimants**                                         rjohnson@ij.org

                                                  Wesley Hottot
                                                  WA State Bar No. 47,539*
                                                  10500 NE 8th Street, Suite 1760
                                                  Bellevue, WA 98004-4309
                                                  Telephone: (425) 646-9300
                                                  Facsimile: (425) 990-6500
                                                  Email: whottot@ij.org

                                                  * Admitted _Pro Hac Vice_


_Attorneys for Claimants_
_Lyndon B. McLellan and L&M Convient Mart, Inc._

20

## CERTIFICATE OF SERVICE

I hereby certify that on this the 29th day of May 2015, the foregoing **RESPONSE OF CLAIMANTS LYNDON B. MCLELLAN AND L&M CONVIENT MART, INC. TO PLAINTIFF'S MOTION FOR VOLUNTARY DISMISSAL WITHOUT PREJUDICE** was filed with the Clerk of Court using the CM/ECF system which will send notification to counsel at the following address:

Stephen A. West
United States Attorney's Office
310 New Bern Avenue
Federal Building, Suite 800
Raleigh, North Carolina 27601-1461
Email: steve.west@usdoj.gov

*/s/ Robert Everett Johnson*
Robert Everett Johnson
901 North Glebe Rd., Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
Facsimile: (703) 682-9321
Email: rjohnson@ij.org

*Attorney for Claimants*